UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEBBER COMMERCIAL PROPERTIES, LLC, <br><br> Plaintiff, <br> v. <br><br> MT. HAWLEY INSURANCE COMPANY, and RENAISSANCE RE SYNDICATE 1458 LLOYDS, <br><br> Defendants. | **MEMORANDUM & ORDER** <br> 24-CV-6834 (HG) (TAM) |

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Webber Commercial Properties, LLC ("Webber") filed this action against Mt. Hawley Insurance Company and Renaissance Re Syndicate 1458 Lloyds (collectively, "Insurers") after they allegedly failed to fully indemnify Webber for property damage sustained because of a windstorm. Webber brought claims against the Insurers for breach of contract, declaratory judgment, and bad faith under the Florida Insurance Code. The Insurers moved to dismiss the claims for declaratory judgment and bad faith. Because the declaratory judgment and breach of contract claims are duplicative and the insurance contract unambiguously selects New York—not Florida—law, the motion to dismiss is GRANTED and the declaratory judgment and bad faith claims are dismissed.

## BACKGROUND[1]

This dispute relates to a commercial property insurance policy issued by the Insurers to Webber. The policy covered "direct physical loss" or "damage" to Webber's property from June

---

[1] The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this

2022 to June 2023 and had a total-coverage and per-occurrence limit of nearly $8 million. *See* Decl. of Matthew Campen, Ex. A-1 ("Insurance Policy") at 2, 8 (ECF No. 24-1).[2]

In September 2022, while the policy was in effect, a windstorm inflicted severe damage to one of Webber's properties in Florida. Compl. ¶¶ 6, 13 (ECF No. 1). After nearly two years of inspections, estimates, and negotiations, the parties could not agree on the amount of insurable loss caused by the storm. *Id.* ¶¶ 15–41. As a result, Webber filed this lawsuit.

Webber raises three claims. The first, for breach of contract, states that Insurers failed to "pay plaintiffs under the policy to the full extent of plaintiffs' loss." *Id.* ¶ 60 (capitalization altered). The second, for a declaratory judgment, asserts that Webber's rights under the policy are "uncertain" and asks for a declaration establishing that Insurers "must perform in accordance with all covenants, provisions, forms, and endorsements," "comply with appraisal if demanded, and make payment of recoverable depreciation, in addition to making payment for the subject Loss to the full extent of the policy limit." *Id.* ¶¶ 66, 69. The last claim, for statutory bad faith in violation of Florida law, states that Insurers "knowingly under-adjusted and undervalued the damages resulting from the loss" as part of a "general business practice" intended to "delay the resolution of claims" and "resolve such claims for less than fair value." *Id.* ¶¶ 71, 81 (capitalization altered).

The Insurers move to dismiss the declaratory judgment and bad faith claims. Mot. to Dismiss (ECF No. 22). With respect to declaratory judgment, they argue that declaratory relief would be "duplicative of plaintiff's underlying breach of contract claim" and "premature" to the

---

stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).

[2] Unless otherwise indicated, when quoting cases and parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations.

2

extent "it requests an advisory opinion regarding [Insurers'] obligations under the appraisal provision." Mem. of L. in Supp. Mot. to Dismiss at 22–23 (ECF No. 23) (capitalization altered). As to bad faith under Florida law, Insurers contend that the claim is "not cognizable under the [policy's] valid and enforceable New York choice of law provision." *Id.* at 1–2.

## **LEGAL STANDARD**

A complaint survives a motion to dismiss only if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 106 (2d Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When evaluating a motion to dismiss, a court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences" in favor of the plaintiff. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021); *see also Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

When deciding a motion to dismiss, a court may consider the facts alleged in the complaint, as well as in "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Moreover, even when a document is not attached to or incorporated in the complaint, the court may consider it if the complaint "relies heavily upon its terms and effect" such that the document is "integral" to the complaint. *Id.* at 153.

Here, the complaint does not attach or expressly incorporate the insurance policy, but its claims depend entirely on the policy's terms. Accordingly, the Court may consider the terms of the policy as if they were incorporated in the complaint. *See, e.g.*, *State Farm Mut. Ins. v. Ricciardi*, 782 F. Supp. 3d 1, 9 (E.D.N.Y. 2025) ("For insurance disputes in particular, courts

3

may consider the insurance policies themselves, even if they are not attached to the plaintiff's complaint.").

## DISCUSSION

For the reasons below, the motion to dismiss the declaratory judgment and bad faith claims is granted.

### I. Declaratory Judgment

The Declaratory Judgment Act ("DJA") states that "[i]n a *case of actual controversy within its jurisdiction* . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). Put differently, a district court can issue declaratory relief where it has jurisdiction over an "actual controversy," and where it has jurisdiction it "may" choose whether to exercise it. *See Admiral Ins. v. Niagara Transformer Corp.*, 57 F.4th 85, 92–96, 99–100 (2d Cir. 2023).

With respect to whether a court has jurisdiction, "the phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). To satisfy Article III's case-or-controversy requirement, and therefore the DJA's actual-controversy requirement, there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* In other words, an actual controversy "must be definite and concrete," not "hypothetical or abstract." *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240–41 (1937). When the existence of an actual controversy depends on contingent events—for example, the possibility that a defendant will disregard certain contractual obligations—the court must assess the "practical likelihood that the relevant contingencies will occur." *Admiral*, 57 F.4th at 92. The "party seeking a declaratory

4

judgment"—here, Webber—"has the burden of establishing the existence of an actual case or controversy." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993).

As for a district court's "discretion to decline jurisdiction under the DJA," the Second Circuit has identified a set of factors that "should inform a district court's exercise of such discretion." *Admiral*, 57 F.4th at 99–100. Those factors include:

- (1) "whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved,"
- (2) "whether such a judgment would finalize the controversy and offer relief from uncertainty,"
- (3) "whether the proposed remedy is being used merely for procedural fencing or a race to res judicata,"
- (4) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court,"
- (5) "whether there is a better or more effective remedy," and
- (6) "whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction."

*Id.* A district court has "broad discretion to weigh these and other relevant factors," and "no one factor is sufficient, by itself, to mandate that a district court exercise — or decline to exercise — its jurisdiction to issue a declaratory judgment." *Id.* at 100.

Webber has not met its burden to establish that the Court has jurisdiction to issue the declaratory judgment it seeks. Webber first requests a declaration that Insurers "must perform in accordance with all covenants, provisions, forms, and endorsements" of the policy as it relates to the windstorm loss. Compl. ¶ 69. Yet the complaint does not establish an actual controversy regarding *all* the provisions in the policy. It establishes one relating only to the provisions setting out the calculation of loss. *See id.* ¶ 43. And to the extent Webber fears Insurers will disregard all its policy obligations at some point in the future, the complaint does not allege any facts showing a "practical likelihood" of that occurring. *Admiral*, 57 F.4th at 89.

5

Webber also seeks a declaration that Insurers must "make payment of recoverable depreciation" and "comply with appraisal if demanded." Compl. ¶ 69. These requested declarations relate to two separate provisions of the policy—the replacement cost coverage and the appraisal condition. The replacement cost coverage provision requires Insurers to pay for the replacement cost of property "without deduction for depreciation" once the "property is actually repaired or replaced." Decl. of Matthew Campen, Insurance Policy at 21–22. The appraisal condition provides that if the parties disagree on "the amount of loss, either may make written demand for an appraisal of the loss," and that appraisal shall be "binding." *Id.* at 27.

This declaration request, like the first, is not grounded in any actual controversy. Nothing in the complaint suggests that Insurers have disputed their obligation to pay replacement costs, including depreciation, after repairs are completed or their obligation to submit to appraisal if one is demanded. Indeed, Webber admits that its "rights and remedies" under these provisions are "yet to be exercised." Mem. in Opp'n Mot. to Dismiss at 17 (ECF No. 25).

Webber nonetheless claims that its request for a declaration is "ripe for adjudication now" because of the "potential" for "additional and ongoing litigation" relating to the replacement cost and appraisal provisions. *Id.* at 16–17. In support of this argument, Webber points to a provision in the policy requiring it to bring suit within two years of a covered loss. The provision states that "[n]o one may bring a legal action against [Insurers] under this policy unless . . . [t]he action is brought within 2 years after the date on which the direct physical loss or damage occurred." *Id.* at 16; *see also* Decl. of Matthew Campen, Insurance Policy at 95. Webber then cites *Executive Plaza, LLC v. Peerless Insurance Co.*, 5 N.E.3d 989 (N.Y. 2014), a New York case where an insurance company invoked a similar limitations clause to avoid paying replacement costs for repairs completed after the limitations period expired. *See* Mem. in Opp'n

6

Mot. to Dismiss at 16; *Exec. Plaza*, 5 N.E.3d 989 at 990–91.  In Webber's view, *Executive Plaza* demonstrates the "potential" for "future disputes" that can be prevented with a declaration clarifying that Insurers must comply with the replacement-cost and appraisal provisions notwithstanding the two-year limitations period.  Mem. in Opp'n Mot. to Dismiss at 3, 16–17.

      The problem with Webber's position is that Article III and the DJA require an actual dispute, not a potential one.  Webber's speculation that Insurers might refuse to comply with certain policy provisions after the limitations period expires, simply because another insurer did so in a different case, is almost by definition a "dispute of a hypothetical or abstract character." *Aetna Life Ins.*, 300 U.S. at 240.  And while Webber could demonstrate an actual controversy by showing a "practical likelihood" that Insurers will breach their obligations, nothing in the complaint demonstrates such a likelihood.  If anything, the complaint suggests the opposite:  it alleges that Insurers have "verbally assured" Webber "that it need not repair or replace the damaged property within two years" to recover depreciation.  Compl. ¶ 41.

      Webber views Insurers' failure "to provide this assurance in writing" as proof that they will breach their obligations.  *See id.*  But for one, Webber "has no right to demand reassurance" at all because Insurers have given Webber no "reasonable grounds to believe" they will breach their obligations under the provisions at issue.  *See* Restatement (Second) of Contracts § 251 cmts. a, c (Am. L. Inst. 1981).  For another, Webber points to no principle of law requiring an adequate assurance of performance to be in writing.  The nature of an "adequate" assurance can vary depending on what "is reasonable to require in a particular case."  *Id.* § 251 cmt. e.  And here, where the only alleged ground for belief that Insurers will breach is that another insurer did so in a different case, requiring Insurers to provide written assurances would be unreasonable.

Finally, even if the declaratory relief sought was limited to the actual controversy presented in the complaint—which is whether Insurers have fully covered the windstorm loss— the Court would decline to exercise jurisdiction over that declaratory request. A declaration clarifying whether Insurers have fully indemnified Webber for the windstorm loss would be "redundant" and "duplicative" because Webber's breach of contract claim already requires the Court to determine whether Insurers have fully covered the loss. *Cf. Josie Maran Cosms., LLC v. Shefa Grp.*, 624 F. Supp. 3d 281, 287 (E.D.N.Y. 2022). Accordingly, to the extent Webber seeks a declaration that Insurers have failed to fully reimburse Webber for its loss, the Court declines jurisdiction on the ground that such a declaration would serve no "useful purpose." *Admiral*, 57 F.4th at 99; *see also Hahn v. JetBlue Airways Corp.*, 738 F. Supp. 3d 229, 254 (E.D.N.Y. 2024) ("Courts generally reject a declaratory judgment claim as duplicative when other claims in the suit will resolve the same issues.").

## II. Bad Faith Under Florida Law

Insurers next argue that Webber cannot bring its claim for bad faith under Florida law because the insurance policy provides that New York law shall govern all disputes under the policy. *See* Mem. of L. in Supp. Mot. to Dismiss at 21–22. In response, Webber argues that the New York choice-of-law provision is "unenforceable" because it contradicts other provisions in the policy seemingly requiring the application of Florida law, creating an "irreconcilable ambiguity." Mem. in Opp'n Mot. to Dismiss at 10.

The scope of a choice-of-law clause is a "threshold question" resolved "under the relevant forum's choice-of-law rules," rather than "under the law specified in the clause" itself. *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005). Because federal district courts "apply the state choice of law rules of the state in which they sit," *In re Coudert Bros. LLP*, 673 F.3d 180, 188 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg.*

8

*Co.*, 313 U.S. 487, 496 (1941)), the effect of the clause here is determined by New York's choice-of-law rules. Those rules, in turn, require courts to "decide the scope of such clauses under New York law." *Fin. One Pub.*, 414 F.3d at 333. Accordingly, the reach of the choice-of-law clause is ultimately a matter of New York law.

Under New York law, "insurance contracts are construed by applying general principles of contract interpretation." *Consol. Rest. Operations, Inc. v. Westport Ins.*, 235 N.E.3d 332, 336 (N.Y. 2024). The most "fundamental" principle of contract interpretation is that "the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022). A contractual provision is therefore unambiguous "if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *In re Viking Pump, Inc.,* 52 N.E.3d 1144, 1151 (N.Y. 2016). Conversely, a provision is ambiguous only if "the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." *Donohue*, 184 N.E.3d at 867.

The choice-of-law clause here is unambiguous. The language is unmistakable: "All matters arising hereunder including questions related to the validity, interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York." Decl. of Matthew Campen, Insurance Policy at 89. Webber does not dispute that whether Insurers acted in bad faith is a matter relating to Insurers' performance under the policy. The provision therefore reveals the parties' intent and permits only one reasonable interpretation: all matters arising under the policy—including whether Insurers

9

performed in bad faith—must be determined in accordance with the laws of New York, not Florida.

Notwithstanding this express language, Webber sees ambiguity. It reasons that although the choice-of-law provision appears to select New York contract law, it cannot mean what it says because other provisions refer to "ordinances" and "laws" in contexts that indicate the policy is referring to the "ordinances" and "laws" of the place where the property is located—which is Florida, not New York. According to Webber, if the policy regularly invokes local law despite the choice-of-law clause, there is an "irreconcilable ambiguity" as to whether the policy selects New York or local law. *See* Mem. in Opp'n Mot. to Dismiss at 10–11. It therefore concludes that the policy must be interpreted to select the laws of Florida, not New York, given the doctrine that ambiguities in an insurance policy must be construed in favor of the insured. *See id.* at 10, 13.

The fatal flaw in Webber's reasoning is that it makes a category error. The choice-of-law provision is not in conflict with the provisions referring to local law because the former selects which law governs the interpretation of the contract, whereas the latter describes factual conditions that shape the parties' rights and obligations. This is evident from the language and context of the provisions. The choice-of-law clause is placed under the heading "Legal Action Against Us," and it applies to all "matters" arising under the policy—such as its "validity, interpretation, performance, and enforcement," all of which pertain to the resolution of legal disputes between the parties. Decl. of Matthew Campen, Insurance Policy at 88 (capitalization altered).

The provisions referring to local law, on the other hand, have nothing to do with the law governing disputes. One such provision, for example, provides that Insurers will pay for costs

10

"incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding, or replacement of damaged parts of [the] property." *Id.* at 11.  Another states that the Insurers will inspect the property only to determine "insurability and the premiums to be charged," except that Insurers may perform inspections required "relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators." *Id.* at 50.  These provisions, like the others Webber cites, do not purport to select the law governing disputes but instead acknowledge that local laws may, as a factual matter, trigger rights or obligations under the policy.  The local law provisions therefore do not undermine the choice-of-law clause's unambiguous command—disputes under the policy are to be resolved under New York law, not Florida law.

Webber makes one last argument.  In its view, New York's choice-of-law rules require courts to conduct a conflict-of-laws analysis to determine which law applies even when the policy purports to select a particular state's law.  And because the policy here relates to property in Florida, not New York, Webber claims that a conflict-of-laws analysis would require the application of Florida law.  *See* Mem. in Opp'n Mot. to Dismiss at 8–9.

New York choice-of-law rules, however, require precisely the opposite.  Under New York General Obligations Law Section 5-1401(1):

> The parties to any contract . . . in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars . . . may agree that the law of [New York] shall govern their rights and duties . . . whether or not such contract . . . bears a reasonable relation to [New York].

In *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 982 N.E.2d 609 (N.Y. 2012), the New York Court of Appeals held that, so long as "transaction exceed[s] $250,000," Section 5-1401 obviates the need for "a conflict-of-laws analysis" and "dictates that New York substantive

11

law applies when parties include an ordinary New York choice-of-law provision" in their agreement. *Id.* at 610, 612. The New York Court of Appeals later extended this principle to "contracts that do not fall under General Obligations Law § 5-1401" in *Ministers & Missionaries Benefit Board v. Snow*, 45 N.E.3d 917, 918 (N.Y. 2015). In sum: if the contract selects New York law, New York law applies—regardless of the amount at stake.

Webber does not dispute these settled principles of New York law. Instead, Webber relies on a single district court decision that conducted a conflict-of-laws analysis despite the presence of a New York choice-of-law clause. In *BDO U.S.A., P.C. v. Rojas*, No. 24-cv-101, 2024 WL 3236822 (S.D.N.Y. June 27, 2024), the court held that it was bound to conduct such an analysis because of the Second Circuit's decision in *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020). *See BDO U.S.A.*, 2024 WL 3236822, at *6. *Moseley* was decided after *Ministers* and held that under New York law "contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *Id.* The district court acknowledged that "*Moseley* is difficult to square with *Ministers*[']. . . unequivocal directive that New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision." *Id.* at *7. Even so, the court concluded that it was "technically bound to follow the Second Circuit's interpretation of New York law unless and until it is overruled by the Second Circuit itself." *Id.*

*Moseley* has no application here. Even if *Moseley* stands for, contrary to *Ministers*, the general principle that choice-of-law provisions are enforceable only when the chosen state has sufficient contacts to the transaction, it does not speak to New York's specific exception for contracts falling under General Obligations Law Section 5-1401. Indeed, *Moseley* itself states that it is applying the "*general rule* for assessing the effectiveness of contractual choice-of-law

12

provisions," and it says nothing about Section 5-1401. *Moseley*, 980 F.3d at 20 (emphasis added).

Webber does not contest the applicability of Section 5-1401—and rightly so. The policy's limit of liability is almost $8 million, which is more than enough to qualify as a "transaction covering . . . not less than two hundred fifty thousand dollars." N.Y. Gen. Oblig. Law § 5-1401(1); *see also La. Revitalization Fund LLC v. Starr Surplus Lines Ins.*, No. 23-cv-1006, 2024 WL 1337617, at *4 (S.D.N.Y. Mar. 27, 2024) ($22 million limit of liability satisfied Section 5-1401's requirement that a transaction cover at least $250k). Because the policy falls squarely Section 5-1401's scope, its New York choice-of-law clause is enforceable, and Webber's bad faith claims under Florida law must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Insurers' motion to dismiss is GRANTED and the declaratory judgment and bad faith claims are dismissed. Moreover, leave to amend is denied because plaintiff "has not requested [it]" or "indicated what facts, if any, [it] could plead to survive dismissal if provided an opportunity to amend [its] complaint." *Mallett v. Town of Huntington*, No. 24-cv-5463, 2025 WL 2630387, at *7 (E.D.N.Y. Sept. 12, 2025); *see Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("While leave to amend under the Federal Rules of Civil Procedure is 'freely granted,' *see* Fed. R. Civ. P. 15(a), no court can be said to have erred in failing to grant a request that was not made.").

SO ORDERED.

                                         /s/ Hector Gonzalez
                                         HECTOR GONZALEZ
                                         United States District Judge

Dated: December 7, 2025
        Brooklyn, New York